John J. Albino and Louise Albino v. Commissioner.
Albino v. Commissioner
Docket No. 64315.
United States Tax Court
T.C. Memo 1959-1; 1959 Tax Ct. Memo LEXIS 248; 18 T.C.M. (CCH) 1; T.C.M. (RIA) 59001; January 9, 1959
*248 William P. Christy, Jr., Esq., Syracuse-Kemper Building, Syracuse, N. Y. for the petitioners. Clarence P. Brazill, Jr., Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the income tax of petitioners, as follows: Additions to
Tax Under § 293(a),
IRC of 1939 and
Year
Deficiency § 6653(a), IRC of 1954
1952
$ 228.50
$ 11.43
1953
3,885.86
190.24
1954
627.68
31.38
The respondent determined the deficiencies for the years in question by means of a net worth computation and the only issues raised by the petitioner are (1) whether the petitioner's inventory on December 31, 1951 was $4,410, as contended by petitioner, or $3,364.05, as set forth by the respondent in his net worth computation, and (2) whether the petitioner had cash on hand on December 31, 1951, in the amount of $19,500, as contended by the petitioner, or $2,262.37, as set forth by the respondent in the net worth computation. Findings of Fact Petitioners John J. and Louise Albino are husband and wife residing in Syracuse, New York, and they filed their joint income tax returns *249 for the years 1952, 1953 and 1954 with the district director of internal revenue for the twenty-first district of New York, at Syracuse, New York. Since Louise is a petitioner because of the joint returns, John J. Albino will be referred to as the petitioner. Petitioner has been in the retail and wholesale poultry business as a sole proprietorship for the past 19 years. Respondent determined that there were deficiencies in the income tax of petitioner during the taxable years 1952, 1953 and 1954 by using the increases in the net worth plus expenditures method, all as set forth in the statutory notice of deficiency. Respondent used an inventory figure of $3,364.05 as a closing inventory figure as of December 31, 1951. This figure was in accordance with petitioner's 1951 income tax return which showed such closing inventory figure. Respondent in his net worth computation used a figure of $2,262.37 as undeposited cash on hand on December 31, 1951. The following shows petitioner's income as reported and as computed by respondent's net worth computation during the years in question: Income as Shown
Income
by Net Worth
Year
Reported
Computation
1952
$3,865.46
$ 4,965.87
1953
4,717.75
19,090.76
1954
3,785.20
7,250.93
*250 Respondent's figures as to inventory and cash on hand December 31, 1951, as shown in the net worth computation were correct. Opinion Respondent determined the deficiencies in income tax for the years 1952, 1953 and 1954 by the net worth and expenditures method. Petitioner's only assignments of error charge respondent with using an incorrect inventory figure as of January 1, 1952 and incorrect cash on hand balances at the beginning and end of each of the years in question. Petitioner is engaged in the retail and wholesale poultry business. Petitioner reported his closing inventory on his 1951 tax return at $3,364.05. Respondent, in his net worth computation, also determined petitioner's inventory for January 1, 1952 to be $3,364.05. No actual inventory was ever taken. Petitioner contends this opening inventory figure should be $4,410. He testified it should be that figure but he could not explain why and his figure is no more than an estimate that is unsubstantiated by any documentary evidence. In fact, he also testified the $3,364.05 figure was probably the best figure to take. We hold for respondent on the issue. Petitioner testified he had $19,500 of undeposited cash on *251 hand on December 31, 1951, which he deposited in his business bank account as follows: $1,500 in the year 1952; $14,500 in the year 1953; and $3,500 in the year 1954. Petitioner's story as to the $19,500 cash hoard is utterly unworthy of belief. He first said the source of this hoard was the proceeds from the sale of a building in 1947 for $36,457.44. But this was all originally deposited in his bank account. He said he withdrew part of it and held it in cash. Then he said he used this in gambling activities but he swore off gambling on December 31, 1951 and counted up his cash which was slightly in excess of $19,500. He said he kept this cash hoard in four places, - "The safe, a night bag, in my cellar, and my pocket." He was vague about the amounts kept in each place but he said he would have two or three thousand dollars in his pocket and about the same in the cellar and the balance in his safe and the night bag, with more in the night bag. He said the money in the cellar was kept in "No definite place." When asked on cross examination if he kept it under the rafters or in the coal room he said, "some of them places you mentioned, sure." He told an incredible story about the night *252 bag hoard. He said this bag is a bag used to deposit money outside the bank in a vault used for depositing money after banking hours. He said he had a key to this vault and he put about $10,500 in the night bag and put it into the night depository vault without a deposit slip. It was his story that when the bank called him the next day about there being no deposit slip, he told the bank he did not want the money deposited and the bank just "put it under file" for him. He testified the bank just held the bag for him "undeposited" and he would keep it there "three months, two months, a week, the next day." He said he would take the bag out of the bank and hold it just a "couple of hours" and take it back to the bank and he added: "But I gave strict orders to the bank I didn't want it deposited." The record shows petitioner on November 13, 1951 submitted a net worth statement to The Syracuse Trust Company for the purpose of making a loan and the statement shows cash on hand of $2,500 and $1,500 in a savings account. On December 18, 1951 petitioner borrowed $2,000 from The Syracuse Trust Company and repaid it on December 26, 1951. He also made several other bank loans during each of *253 the years 1952 and 1953, usually in the sum of $2,500 at a time, and sometimes he would renew all or part of such loans on the due dates. When asked to explain why he made these loans when, according to his story he had a large hoard of undeposited cash during these years, he said it was to build up his bank credit for use if necessary in his gambling activities. He testified he did not run any gambling games but he frequented a gambling house. Petitioner was an evasive witness telling a singularly improbable story and his attitude on the stand was that of a man who was irked when asked to relate such dreary details as where, in the cellar, he kept his cash hoard and just how he managed the night bag "undeposited" bank deposit of some ten thousand dollars. His frequent short term bank borrowings of around $2,500 and his renewals of such loans at a time when he had, according to his story, a bag of cash in the sum of as much as $10,500 "on file" in the bank, and more cash some place in his cellar, casts much doubt on the existence of any cash hoard. His explanation that he wanted to build up bank credit for his gambling activities conflicts with his other story that he gave up all *254 gambling activities December 31, 1951 - most of the loans were made in 1952 and 1953 after he had stopped all gambling activities. We hold for respondent on the issue. Decision will be entered for the respondent.